UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUSAN KOSTIN, <br><br> *Plaintiff*, <br><br> *v.* <br><br> PACIFIC INDEMNITY COMPANY and FEDERAL INSURANCE COMPANY, <br><br> *Defendants.* | Civil No. 3:17-cv-1320 (JBA) <br><br> April 10, 2018 |

**RULING ON MOTION TO DISMISS**

Plaintiff Susan Kostin brings this action for breach of contract and bad faith, claiming that Defendants Pacific Indemnity Company and Federal Insurance Company have wrongfully refused to defend and indemnify her. Plaintiff's family company had an investment account with Bernard Madoff, and Plaintiff withdrew $3.75 Million from the company's Madoff account in 2007-2008. After the discovery of Madoff's fraud, the Bankruptcy Trustee commenced an adversary proceeding against Plaintiff and others for recovery of withdrawn funds, and settled with Plaintiff for $3.375 Million. Plaintiff alleges that her losses were caused by Madoff making "wrongful entries in the [Kostin] Company Account in order to perpetuate [his] Ponzi Scheme[,]" and that the Primary Policy and Excess Policy at issue here define covered personal injuries to include "wrongful entry." For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED.

    **I.    Background**

Plaintiff is a resident of Darien, Connecticut, while Defendants maintain their principal place of business in New Jersey. (Compl. [Doc. # 1-2] ¶¶ 1-4.) Plaintiff's late husband, Edward

Kostin, purchased from Defendants a Masterpiece Homeowner's Insurance Policy (the "Primary Policy") and a Masterpiece Excess Liability Policy (the "Excess Policy"). (*Id.* ¶¶ 7-9.) The Primary Policy insured the Kostins' home and personal property and provided personal liability coverage to covered persons. (*Id.* ¶ 12.) The Excess Policy provided coverage excess to the Primary Policy. (*Id.* ¶ 13.)

Edward Kostin formed the Kostin Company, a family partnership, to manage the family assets. (*Id.* ¶ 15.) Beginning in approximately 1972, Mr. Kostin, through the Kostin Company, maintained an account with Bernard L. Madoff Investment Securities, LLC ("Madoff"). (*Id.* ¶ 16.) Federal law enforcement and regulatory authorities subsequently discovered that Madoff was perpetrating a massive Ponzi scheme. (*Id.* ¶ 17.) When members of the Kostin Company withdrew funds that they believed to be investment returns from Madoff, these funds were in fact money that other customers had given to Madoff. (*Id.* ¶ 20-21.) At the time that the Madoff fraud was revealed by federal authorities in December 2008, the Kostin Company Account had a purported net asset value of approximately $121 Million. (*Id.* ¶ 22.)

As a result of the pyramid scheme, Plaintiff "lost" the $121 Million she believed was in the account, as well as her family's principal—the real money that they had actually put in. (*Id.* ¶ 23.) Between April 2, 2007 and October 1, 2008, Plaintiff withdrew a total of $3.75 Million from the Company's Madoff account. (*Id.* ¶ 24.) Plaintiff claims that Madoff during this time period "made wrongful entries into the Personal Account of [Plaintiff], to disburse to her money belonging to other [Madoff] customers in order to further the goals of the Ponzi scheme[.]" (*Id.* ¶ 25.)

As a result of the public disclosure of the Ponzi scheme perpetrated by Madoff, Plaintiff learned that the account entries made by Madoff evidencing profits were wrongful in that the entries actually consisted of fictitious profits and that the funds transferred by Madoff into

Plaintiff's personal account consisted of other people's money. (*Id.* ¶ 27.) In the aftermath of the revelation of the fraudulent scheme, a bankruptcy proceeding focused on the liquidation of Madoff's company and Madoff's personal assets was commenced in the United States Bankruptcy Court for the Southern District of New York. (*Id.* ¶ 28.) Irving H. Picard was appointed as Bankruptcy Trustee. (*Id.*) In November 2010, the Trustee commenced an adversary proceeding in the United States Bankruptcy Court against Plaintiff, the Kostin Company, and other Kostin family members, denominated as *Picard v. Kostin Company*, Adversary Proceeding No. 10-04950 (BRL). (*Id.* ¶ 29.) The Trustee's complaint did not allege that Plaintiff or the Kostin Company had any knowledge of the fraud. (*Id.* ¶ 30.)

Plaintiff alleges that she timely notified Defendants of the claims being made against her and sought coverage. (*Id.* ¶ 34.) The Primary Policy requires the insurer to "cover damages a covered person is legally obligated to pay for personal injury or property damage which take place anytime during the policy period and are caused by an occurrence." (*Id.* ¶ 35.) Defendants denied Plaintiff's claim. (*Id.* ¶ 44.) Plaintiff secured counsel at her own expense, who contested the Trustee's claim over the course of four years. (*Id.* ¶ 46.) Following a mediation, Plaintiff settled the Trustee's claim, agreeing to return $3.375 Million. (*Id.* ¶ 48.) Plaintiff's attorney's fees and litigation costs exceeded $799,000. (*Id.* ¶ 47.) Defendants refused to reimburse Plaintiff for the costs of her legal defense or for the settlement amount. (*Id.* ¶¶ 51-52.)

**II.   Discussion**

**A.   <u>Legal Standard</u>**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed

3

allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6). "[A] complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Holloway v. King*, 161 F. App'x 122, 124 (2d Cir. 2005) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

B. **Breach of Contract**

Plaintiff claims that Defendants' "refusal, neglect, and failure to defend [her] and to indemnify her constitutes a breach of the Primary Policy and Excess Policy." (Compl. ¶ 59.)

"[T]he interpretation of an insurance contract presents a question of law . . . ." *Misiti, LLC v. Travelers Prop. Cas. Co. of Am.*, 308 Conn. 146, 154 (2013) (citations omitted). This interpretation "involves a determination of the intent of the parties as expressed by the language of the policy[.]" *Id.* (internal quotation marks and citations omitted). An insurance contract "must be viewed in its entirety" with the words of the policy given "their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . ." *Id.* at 154-155 (internal quotation marks and citations omitted) (alterations in original).

The Court concludes that as a matter of law, the "wrongful entry" coverage provided by the Primary and Excess Policies here does not extend to the liability that Plaintiff faced as a result of Madoff's false accounting practices and fraud. As explained below, while the phrase "wrongful entry" might be interpreted in the context of this policy to include a variety of unauthorized or otherwise tortious intrusions into real property, personal property, or electronic accounts, it cannot reasonably be interpreted to include the making of fraudulent ledger book "entries." And

4

while Plaintiff also claims that Madoff in effect intruded into her account without authorization, Plaintiff supports this allegation by claiming only that Madoff engaged in unauthorized transactions *once within* her account and not that Madoff lacked authorization to access her account. (Compl. ¶¶ 20-21.)

The Primary Policy states that the insurer will "cover damages a covered person is legally obligated to pay for personal injury or property damage which take place anytime during the policy period and are caused by an occurrence, unless stated otherwise or an exclusion applies." (Ex. A (Primary Policy) to Compl. at T-1.)[1] The Policy defines "damages" as "the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing." (*Id.*)[2] "Personal injury" is defined to include "the following injuries, and resulting death: bodily injury; shock, mental anguish, or mental injury; false arrest, false imprisonment, or wrongful detention; wrongful entry or eviction; malicious prosecution or humiliation; and libel, slander, defamation of character, or invasion of privacy." (*Id.*) Plaintiff does not seek coverage for "property damage" under the policies but only for "personal injury[,]" as defined above. (Mem. Law Opp'n Mot. Dismiss [Doc. # 27] at 9.)

---

[1] Defendants maintain that Plaintiff is not a "covered person" under the insurance contract. Because the Court finds that Plaintiff's coverage claim fails for other reasons, the Court declines to decide this question and assumes for the purpose of this Order that Plaintiff is a covered person.

[2] Defendants also contend that "[t]he [T]rustee in the Claw Back Action [was] not seeking damages, as required to trigger coverage under the policies." (Mem. Law. Supp. Mot. Dismiss [Doc. # 26] at 17.) Because this position is difficult to reconcile with the policy's broad definition of "damages," given the extensive litigation history and arms-length negotiation of a settlement as alleged here, the Court will assume that the alleged damages qualify as "damages" under the insurance policy for the purpose of deciding this Motion to Dismiss.

In her claim for breach of contract, Plaintiff argues that because the term "wrongful entry" is "undefined in the Policies[,]" the Court should determine the term's meaning by referring to the dictionary definition of the term. (*Id.* at 14.) In support of this theory, Plaintiff cites to *Buell Industries, Inc. v. Greater New York Mutual Ins. Co.* for the proposition that "reference to the dictionary" can "assist" in the court's interpretation of a given term. 259 Conn. 527, 539 (2002).

While a dictionary can provide some assistance in clarifying the range of possible definitions of a word, it does not answer the ultimate question of how to understand that word's meaning in the context in which it appears. For example, Webster's Third New International Dictionary defines "entry," as relevant here, to mean both "the act of entering" and "the act of making or entering a record" or "something that is entered" as part of record. But as explained below, the phrase "wrongful entry" can only reasonably be read in context to refer to an unauthorized or otherwise tortious "act of entering"—i.e. an instrusion—and not as the act of wrongfully "making or entering a record."

Plaintiff's argument fails in part because the term "wrongful entry" does not appear alone in this insurance policy. The term appears as part of the phrase "wrongful entry *or eviction*." (Primary Policy at T-1 (emphasis added).) Moreover, this dyad itself appears in a list of specifically enumerated types of covered personal injuries, most of which are grouped thematically around different types of torts and categories of harm, i.e. "shock" is grouped with "mental anguish" and "mental injury"; "false arrest" is grouped with "false imprisonment" and "wrongful detention"; "malicious prosecution" with "humiliation"; and "libel" with "slander, defamation of character, or invasion of privacy." (*Id.*) Thus, in the context in which it appears, "wrongful entry" cannot be reasonably read to encompass *any* imaginable type of entry that is somehow wrongful. The phrase's meaning is cabined, instead, to the range of meanings possible given that it is part of a

disjunctive pair with the word "eviction," as part of a list of thematically-grouped types of harm and tortious conduct. *See Buell*, 259 Conn. at 562 (interpreting policy terms "wrongful entry or eviction, or other invasion of the right of private occupancy" in light of their appearance in context of a list of other enumerated covered personal injuries). In this context, "wrongful entry" must be read to mean something akin to an unauthorized or tortious intrusion.

Plaintiff contends that because "wrongful entry" may be used as just another term for "trespass" and because "trespass" is a broad concept that is no longer necessarily limited as a rule to trespasses upon real property, the term "wrongful entry" is "susceptible to multiple interpretations[,]" ambiguous, and must be construed in favor of Plaintiff's "objectively reasonable interpretation." (Mem. Law Opp'n Mot. Dismiss at 9.) While the Court agrees with Plaintiff that the phrase "wrongful entry" might encompass trespassory intrusions into non-real property,[3] such as electronic accounts, such a construction does not help Plaintiff here, because the gravamen of Plaintiff's claim does not involve any type of unauthorized intrusion.

The face of Plaintiff's Complaint makes clear that the "wrongful entry" at issue here was not a tortious act of entering or intrusion but instead a fraudulent act of making or entering a record. (*See* Compl. ¶ 19 ("Madoff made wrongful entries in the Company Account in order to perpetuate the Ponzi Scheme.")) In at least one instance in the Complaint, Plaintiff seems to elide

---

[3] *See Dilbert v. Hanover Ins. Co.*, 63 Mass. App. Ct. 327, 331 (2005) (rejecting argument that "wrongful entry is a cause of action found exclusively in landlord-tenant law" and holding that "trespass equates to wrongful entry"); *Great N. Nekoosa Corp. v. Aetna Cas. & Sur. Co.*, 921 F. Supp. 401, 417 (N.D. Miss. 1996) (noting that under Mississippi law, "wrongful entry is just another way of saying trespass" and that trespass "is extremely broad, ranging from dispossessing to much more esoteric invasions"); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 249 (S.D.N.Y. 2000) (unauthorized access to electronic database constituted trespass to chattels), *aff'd as modified*, 356 F.3d 393 (2d Cir. 2004).

the difference between these two different meanings of the word "entry" by claiming that Madoff "made wrongful entries *into* the Personal Account of [Plaintiff]." (*Id.* ¶ 25 (emphasis added).)

Plaintiff acknowledges the difference between these two meanings of the word "entry" in her Memorandum in Opposition: "[Madoff's] actions were a 'wrongful entry' in that he was not authorized to enter [Plaintiff's] account to place other client's [sic] funds into [Plaintiff's] account, and alternatively, he committed a 'wrongful entry' by recording funds into [Plaintiff's] account ledger that were fictitious." (Mem. Law Opp'n Mot. Dismiss at 2.)

But Plaintiff's Complaint does not suggest that Madoff lacked the right to make entries in her account or that he made any sort of wrongful intrusion. Indeed, the face of Plaintiff's Complaint implies that because she had entrusted her assets to Madoff for investment, she fully intended him to be able to maintain the financial accounts that he managed on her behalf. Madoff's breach of fiduciary duties and criminal acts committed while accessing Plaintiff's accounts does not mean that he lacked permission to access the accounts at all.

Despite the Complaint's isolated and perfunctory allegation that Madoff made wrongful entries "into" Plaintiff's account, the Complaint as a whole reflects that the "wrongful entries" at issue consist of fraudulent accounting practices, rather than unauthorized intrusions. (*See* Compl. ¶ 27 ("[Plaintiff] learned that the account entries made by Madoff evidencing profits were wrongful in that the entries actually consisted of fictitious profits and that the funds transferred by [Madoff] into the [P]laintiff's Personal Account consisted of other people's money.").) The Complaint's suggestion that Madoff "wrongfully entered" Plaintiff's account in a manner akin to an unauthorized intrusion is thus conclusory and unsupported by any factual allegations.

Plaintiff advances two more arguments for why, in context, the phrase "wrongful entry" is ambiguous and should be read to encompass her claim here. First, Plaintiff contends that

8

"wrongful entry" "should not be read in conjunction with the term eviction[,]" suggesting that to do so would make one of the terms superfluous. (Mem. Law Opp'n Mot. Dismiss at 16-17.) But "wrongful entry" and "eviction" have distinct meanings. While there are courses of conduct that might simultaneously constitute such a wrongful entry and an eviction, there can also be wrongful entry that is not an eviction. Accordingly, Plaintiff's argument is ill-founded.

Second, Plaintiff argues that "had [D]efendants wished wrongful entry to be limited to invasions of real property, they could have used the common insurance phrase 'wrongful entry or eviction or other invasion of the right of private occupancy.' " (*Id.* at 17.) The Court does not read "wrongful entry" in the context of this policy to be limited to invasions of *real* property, just to involve an act of intrusion. But as noted above, the fact that "wrongful entry" may be read to encompass invasions of non-real property does not help Plaintiff here, where the face of the Complaint makes clear that Madoff's fraud did not involve any unauthorized intrusion but a different definition of "entry" entirely.

The Court has considered Plaintiff's other arguments and finds them unavailing.

**C.**    **Bad Faith**

Plaintiff also claims that Defendants' "decision to deny [her] claim . . . was in bad faith." (Compl. ¶ 63.) The "duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . ." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 794 (2013) (internal quotation marks omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . ." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004) (internal quotation marks and citation omitted). Here, Plaintiff

has alleged no facts and presented no arguments that demonstrate a plausible bad faith claim, even apart her from her novel but failed breach of contract claim. Accordingly, this claim also must be dismissed.

### III. Conclusion

For the reasons set forth above, the Court GRANTS Defendants' Motion to Dismiss. The Clerk is directed to close the case.

IT IS SO ORDERED.

      /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of April 2018.